**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| **WHIDDEN MEMORIAL HOSPITAL,** |
| **Plaintiff,** |
| **v.** |
| **KATHLEEN SEBELIUS,** **Secretary of the United States Department** **of Health and Human Services,** |
| **Defendant.** |

Civil Action No. 09-2231 (JEB)

## MEMORANDUM OPINION

Plaintiff Whidden Memorial Hospital here challenges a final decision by the

Administrator of the Centers for Medicare & Medicaid Services (CMS) denying two of its claims

for reimbursement under the Medicare program. First, after it underwent a statutory merger with

another hospital, the Melrose-Wakefield Hospital Association (MWHA), Whidden sought

reimbursement for the depreciation of its assets. The Administrator denied this claim on two

independently dispositive grounds: it concluded both that the Whidden-MWHA merger did not

constitute a *bona fide* sale and that the parties to the merger were not unrelated. Second,

Whidden requested additional reimbursement for costs incurred by its new Transitional Care

Unit (TCU) under the "new-provider" exemption to the usual limitations placed on such

reimbursements. The Administrator denied this claim, too. She determined that the Whidden

TCU had previously been owned by another institution, Care Well Manor Nursing Home, that

had also operated as the equivalent of a skilled nursing facility, meaning the TCU did not qualify

as a "new" provider of such services. In addition, she found that the facility's relocation from

Malden, Massachusetts (where Care Well had been located), to Everett, Massachusetts (where

the Whidden TCU was located), did not qualify the TCU under the "relocated-provider"

provision of the new-provider exemption.

In bringing this suit, Whidden maintains that the Administrator's denials of its two claims

were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or

"unsupported by substantial evidence" in violation of the Administrative Procedure Act. Both

parties now seek summary judgment. The Court's ultimate decision is split, awarding the first

round to the Administrator and the second to Whidden.

On the first issue, our Circuit has twice upheld the agency's interpretation of the relevant

regulations to authorize reimbursement for a depreciation loss on a statutory merger only when

that merger constitutes a *bona fide* sale, and the Administrator's determination that the merger

here did not so qualify was supported by substantial evidence in the record. On the second

question, even if the Administrator was correct that Care Well was the previous owner of the

Whidden TCU for purposes of the regulation, her subsequent determination that Care Well had

operated as the equivalent of a skilled nursing facility was arbitrary and capricious and

unsupported by substantial evidence. Such a determination moots analysis of the relocated-

provider provision. The Court, accordingly, will grant summary judgment for Defendant on the

statutory-merger issue and remand the matter to HHS on the new-provider issue.

I.      **Background**

The Medicare program, which is administered by CMS on behalf of the Secretary of the

Department of Health and Human Services, provides federally funded health insurance for the

elderly and the disabled. See 42 U.SC. § 1395 *et seq.* Providers of Medicare services like

Whidden are statutorily entitled to reimbursement for the "reasonable cost" of Medicare services.

Id. § 1395f(b)(1). As articulated above, this case concerns two of Whidden's claims for

reimbursement under the Medicare program.  Each claim implicates a distinct regulatory

framework and a distinct set of facts, which the Court will set out separately.

     A.  Depreciation Loss on Merger

        1.  *Regulatory Framework*

Medicare regulations provide that "an appropriate allowance for depreciation on

buildings and equipment used in the provision of patient care is an allowable cost."  42 C.F.R. §

413.134(a); see Forsyth Mem'l Hosp., Inc. v. Sebelius, 639 F.3d 534, 536 (D.C. Cir. 2011); St.

Luke's Hosp. v. Sebelius, 611 F.3d 900, 901 (D.C. Cir. 2010).  The depreciation allowance for a

given asset is determined by prorating the "historical cost" of that asset — *i.e.*, "the cost incurred

by the present owner in acquiring the asset" — over its "estimated useful life."  See 42 C.F.R. §

413.134(a)-(b); St. Luke's, 611 F.3d at 901.  Medicare will reimburse providers for a percentage

of that allowance equal to the portion of the asset's use devoted to Medicare services.  See 42

C.F.R. § 413.134(a)-(b); St. Luke's, 611 F.3d at 901.  "In other words, the annual reimbursable

allowance is equal to the actual cost divided by the number of years of its useful life and then

multiplied by the percentage of the asset's use devoted to Medicare services in the given year."

St. Luke's, 611 F.3d at 901.

This methodology, however, "only approximate[s] the actual decline in an asset's value."

Forsyth, 639 F.3d at 536 (quoting Via Christi Reg'l Med. Ctr., Inc. v. Leavitt, 509 F.3d 1259,

1262 (10th Cir. 2007)) (internal quotation marks omitted) (alteration in original).  Because

Medicare reimbursement mechanisms aim to compensate for the costs "actually incurred," 42

U.S.C. § 1395x(v)(1)(A), the regulations provide for an adjustment of the allowable depreciation

cost in certain circumstances when the disposal of an asset indicates that it in fact depreciated

more quickly or more slowly than the formula had predicted.  See 42 C.F.R. § 413.134(f)(1); see

also Forsyth, 639 F.3d at 536; St. Luke's, 611 F.3d at 901-02.  If the consideration obtained upon

disposal is less than the asset's "net book value" — *i.e.*, its historical cost minus previous

depreciation payments, id. § 413.134(b)(9) — the provider has experienced a "loss."  See 42

C.F.R. § 413.134(f)(1).  Conversely, if a provider receives consideration in excess of the net

book value, it has experienced a "gain."  See id.

        If the disposition of an asset that took place before December 1, 1997, resulted in a loss

or gain, the regulations provide for an adjustment of the reimbursable depreciation cost.  See id.;

St. Luke's, 611 F.3d at 902.[1]  Under subsection (f) of the depreciation regulation, "[t]he

treatment of the gain or loss depends upon the manner of disposition of the asset."  Id. § (f)(1).

For example, "[i]f an asset is disposed of through a *bona fide* sale, the treatment is

straightforward: If there is a gain, the selling provider must compensate Medicare therefor; if

there is a loss, Medicare reimburses the provider."  St. Luke's, 611 F.3d at 902 (citing 42 C.F.R.

§ 413.134(f)(2)).  More relevant here, if an asset is disposed of through a "statutory merger

between unrelated parties," subsection (l) provides that the merged corporation may recover for

any depreciation loss incurred under the same framework applicable to asset sales.  See 42

C.F.R. § 413.134(l) (1997) (now § 413.134(k)) ("If the merged corporation was a provider

before the merger, then it is subject to the provisions of paragraphs (d)(3) and (f) of this section

concerning recovery of accelerated depreciation and the realization of gains and losses.").

        2.  *Factual and Procedural Background*

        Prior to August 1, 1996, Everett Cottage Hospital d/b/a Whidden Memorial Hospital was

a Massachusetts non-profit corporation that owned and operated a general acute-care hospital in

Everett, Massachusetts.  See A.R. at 23 (Whidden Mem'l Hosp. v. Blue Cross Blue Shield

---

[1] In 1997, Congress amended the Medicare Act to abolish depreciation adjustments for assets disposed of after December 1, 1997.  See Balanced Budget Act of 1997, Pub. L. No. 105-33, § 4404, 111 Stat. 251, 400 (1997); 63 Fed. Reg. 1379, 1380-82 (Jan. 9, 1998); see also St. Luke's, 611 F.3d at 902 n.3.

Assoc., Decision of the Administrator, Centers for Medicare & Medicaid Servs.); <u>Provider –</u>

<u>Whidden Mem'l Hosp. Everett, Mass. v. Intermediary – Bluecross Blueshield Ass'n/Nat'l Gov't</u>

<u>Servs. – Maine</u>, 2009 WL 3231747, at *4 (P.R.R.B. Jul. 28, 2009). Effective August 1, 1996,

Whidden consummated a statutory merger into another Massachusetts non-profit corporation,

Melrose-Wakefield Hospital Association, which operated a community hospital in Melrose,

Massachusetts. <u>See</u> A.R. at 23; <u>Provider – Whidden</u>, 2009 WL 3231747, at *4. Following this

merger, Whidden ceased to exist as a corporate entity, though the hospital retains its name. <u>See</u>

<u>id.</u> at 23; <u>Provider – Whidden</u>, 2009 WL 3231747, at *4. MWHA acquired all of Whidden's

assets and assumed all of its liabilities. <u>See</u> <u>Provider – Whidden</u>, 2009 WL 3231747, at *4.

Whidden submitted a terminating cost report for the period ending July 31, 1996, which

included a claim for a depreciation loss realized upon its statutory merger. <u>See</u> A.R. at 23;

<u>Provider – Whidden</u>, 2009 WL 3231747, at *5. Associated Hospital Service of Maine, the

Intermediary designated by HHS to process Whidden's claims for reimbursement, disallowed the

claimed loss. <u>See</u> A.R. at 23; <u>Provider – Whidden</u>, 2009 WL 3231747, at *4. It denied

reimbursement because it understood the regulation concerning depreciation losses on mergers to

provide for reimbursement only when a merger constitutes a *bona fide* sale, and it determined

that the Whidden–MWHA merger was not a *bona fide* sale. <u>See</u> A.R. at 23; <u>Provider –</u>

<u>Whidden</u>, 2009 WL 3231747, at *4. In addition, it concluded that Whidden and MWHA were

not "unrelated parties," as required by the regulation. <u>See</u> A.R. at 3; <u>Provider – Whidden</u>, 2009

WL 3231747, at *9.

Pursuant to 42 U.S.C. § 1395oo(a), Whidden appealed the Intermediary's denial of its

request for reimbursement to the Provider Reimbursement Review Board (PRRB). <u>See</u> <u>Provider</u>

<u>– Whidden</u>, 2009 WL 3231747, at *4. The PRRB overturned the Intermediary's disallowance,

concluding that the regulations did not require statutory mergers to meet the requirements of

*bona fide* sales in order for depreciation losses to be compensable.  See id. at *11.  "[O]nce a

transaction is acknowledged to be a statutory merger between unrelated parties," it emphasized,

"the conclusion follows immediately that the provider is entitled to recognition of a loss or gain

on disposition of its assets."  Id.  The PRRB further determined that, even if the regulations

required statutory mergers to constitute *bona fide* sales, the record established that the Whidden–

MWHA merger was, in fact, a *bona fide* sale.  See id. at *11-*12.  Additionally, the PRRB

rejected the Intermediary's argument that the parties to the merger were not "unrelated," as

required by the regulation.  Id. at *10.

The Administrator of CMS, which has the discretion to review any final decision of the

PRRB on behalf of the Secretary, see 42 U.S.C. § 1395oo(f)(1); 42 C.F.R. § 405.1875(a)(1),

reversed, disagreeing with the PRRB at nearly every juncture.  See A.R. at 2, 24-29.  First, she

concluded that the PRRB had erred in concluding that a statutory merger need not amount to a

*bona fide* sale for a loss to be cognizable.  See id. at 24.  "The application of the *bona fide* sale

criteria," the Administrator stated, "is consistent with the plain language of the controlling

regulation and Medicare policy."  Id.  Second, she found that the Whidden–MWHA merger did

not amount to a *bona fide* sale because, *inter alia*, "there was a significant disparity of

consideration tendered in exchange for [Whidden's] assets."  Id. at 26.  Third, even if she had

come out the other way on the *bona fide*-sale question, the Administrator would have denied

reimbursement on the distinct ground that Whidden and MWHA were not "unrelated parties."

See id. at 27-29.

    B.  New Provider Exemption

        1.  *Regulatory Framework*

A Medicare-certified "skilled nursing facility" (SNF) is an institution or a distinct part of

an institution that is "primarily engaged in providing":

> (A) skilled nursing care and related services for residents who
> require medical or nursing care, or
>
> (B) rehabilitation services for the rehabilitation of injured, disabled
> or sick persons, and is not primarily for the care and treatment of
> mental diseases.

42 U.S.C. § 1395i-3(a). During the time period relevant to this case, Medicare reimbursed SNFs

for services provided to Medicare patients based on their "reasonable costs." See generally id.

§§ 1395f(b)(1).

Seeking to encourage Medicare providers to operate efficiently, Congress has instructed

the Secretary of HHS to establish "limits on the [costs] to be recognized as reasonable." 42

U.S.C. § 1395x(v)(1)(A). Consistent with this statutory directive, the Secretary has issued

regulations establishing caps on payments for routine care provided by SNFs. See 42 C.F.R. §

413.30. The caps are referred to as "routine cost limits" (RCLs).

The Secretary, however, has broad authority to establish appropriate adjustments to and

exemptions from RCLs. See 42 U.S.C. § 1395yy(c). One such exemption is the "new-provider"

exemption, which applies to any "provider of inpatient services that has operated as the type of

provider (or the equivalent) for which it is certified under Medicare, under present and previous

ownership, for less than three full years." 42 C.F.R. § 413.30(e) (1997) (now codified at 42

C.F.R. § 413.30(d)). Because new facilities often face "underutilization during the[ir] initial

years," St. Elizabeth's Med. Ctr. of Boston, Inc. v. Thompson, 396 F.3d 1228, 1230 (D.C. Cir.

2005) (quoting HCFA Pub. 15-1, § 2553.1(A)), the new provider exemption "allow[s] a [new]

provider to recoup the higher costs normally resulting from low occupancy rates and start-up

costs during the time it takes to build its patient population." Id. (quoting Paragon Health

Network, Inc. v. Thompson, 251 F.3d 1141, 1149 (7th Cir. 2001)) (second alteration in original).

2. *Factual and Procedural Background*

Before opening an SNF in Massachusetts, a provider must obtain a determination of need

(DON) from the Massachusetts Department of Public Health. See Mass. Gen. Laws Ch. 111, §

25C; see also A.R. at 35, 129. In 1994, Massachusetts adopted a policy under which an

institution wishing to open an SNF, classified under the state regulatory regime as a "Level II"

facility, was required to purchase operating rights from a "Level III" facility, which offers less

skilled care. See A.R. at 35; ; 105 Mass. Code Regs. § 100.720 (1994). After entering into an

operating-rights purchase agreement with a Level III facility and arranging for that facility to

close, the institution could apply for and be issued a DON. See A.R. at 35; Provider – Whidden,

2009 WL 3231747, at *12; 105 Mass. Code Regs. § 100.720 (1994). Responding to an

imbalance of inpatient facilities in Massachusetts, this program was intended "to further the

development of subacute services [provided by Level II facilities] and to allow Level III

providers to gracefully exit the Long Term Care . . . industry." A.R. at 35.

As defined by state regulations, a Level II facility is licensed to "provide continuous

skilled nursing care and meaningful availability of restorative services and other therapeutic

services in addition to the minimum, basic care and services required . . . for patients who show

potential for improvement or restoration to a stabilized condition or who have a deteriorating

condition requiring skilled care." 105 Mass. Code Regs. § 150.001. A Level III facility, on the

other hand, is licensed to "provide routine nursing services and periodic availability of skilled

nursing, restorative and other therapeutic services, as indicated . . . for patients whose condition

is stabilized to the point that they need only supportive nursing care, supervision and observation." Id.

Seeking to open an SNF consistent with this state regulatory framework, in May 1995 Whidden entered into a contractual agreement with Care Well Manor Nursing Home, a Level III facility consisting of eight residential bedrooms in a Victorian-style wooden house located in Malden, Massachusetts. See A.R. at 34, 1959-64, 1966-69, 3725-26, 2837-39. The agreement provided that Whidden would purchase the rights to operate Care Well's 23 beds for approximately $300,000. See id. at 34, 129, 3777-83. Consistent with its agreement with Whidden, Care Well ceased operations when the sale closed in October 1995. See id. at 34. On March 4, 1996, using the operating rights acquired from Care Well, Whidden opened its new transitional care unit (TCU), a hospital-based SNF. See id.

On June 2, 1997, the TCU applied to its Intermediary for a new-provider exemption from the SNF RCLs. See Provider – Whidden, 2009 WL 3231747, at *4. The Intermediary denied its request, determining that because it had purchased operating rights from Care Well, which had been operating as the equivalent of an SNF, the TCU was not a "new" provider. See id. at *4, *13-*14. Whidden appealed to the PRRB. See id. at *4. The PRRB reversed the Intermediary, concluding that the Whidden TCU qualified as a new provider because Care Well was not a prior owner of the TCU, and, even if it were, Care Well had not operated as the equivalent of an SNF. See id. at 19-21.

On its own motion, the CMS Administrator reviewed the PRRB's decision and reversed. The Administrator concluded that Care Well was the prior owner of the TCU, Care Well had operated as the equivalent of an SNF, and the TCU did not qualify under the relocation provision. See A.R. at 37-45.

9

## II.     Legal Standard

Summary judgment may be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006).  A fact is "material" if it is capable of affecting the substantive outcome of the litigation. Holcomb, 433 F.3d at 895; Liberty Lobby, Inc., 477 U.S. at 248.  A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  See Scott v. Harris, 550 U.S. 372, 380 (2007); Liberty Lobby, Inc., 477 U.S. at 248; Holcomb, 433 F.3d at 895.

Although styled Motions for Summary Judgment, the pleadings in this case more accurately seek the Court's review of an administrative decision.  The standard set forth in Rule 56(c), therefore, does not apply because of the limited role of a court in reviewing the administrative record.  See Sierra Club v. Mainella, 459 F. Supp. 2d 76, 89-90 (D.D.C. 2006) (citing National Wilderness Inst. v. United States Army Corps of Eng'rs, 2005 WL 691775, at *7 (D.D.C. 2005); Fund for Animals v. Babbitt, 903 F. Supp. 96, 105 (D.D.C. 1995), amended on other grounds, 967 F. Supp. 6 (D.D.C. 1997)).  "[T]he function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did."  Id. (internal citations omitted).  Summary judgment thus serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review.  See Richards v. INS, 554 F.2d 1173, 1177 & n.28 (D.C. Cir. 1977), cited in Bloch v. Powell, 227 F. Supp. 2d 25, 31 (D.D.C. 2002), aff'd, 348 F.3d 1060 (D.C. Cir. 2003).

The Administrative Procedure Act "sets forth the full extent of judicial authority to review executive agency action for procedural correctness." FCC v. Fox Television Stations, Inc., 129 S. Ct. 1800, 1810 (2009). It requires courts to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). This is a "narrow" standard of review as courts defer to the agency's expertise. Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983). An agency is required to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." Id. (internal quotation omitted). The reviewing court "is not to substitute its judgment for that of the agency," id., and thus "may not supply a reasoned basis for the agency's action that the agency itself has not given." Bowman Transp., Inc. v. Arkansas-Best Freight System, Inc., 419 U.S. 281, 285-86 (1974) (internal quotation omitted). Nevertheless, a decision that is not fully explained may be upheld "if the agency's path may reasonably be discerned." Id. at 286.

**III.    Analysis**

This case presents two independent questions. The first concerns Whidden's statutory merger with MWHA, the second the relationship between Care Well and Whidden's new TCU. The Court will address each in turn and, ultimately, finds for the Secretary on the former and Whidden on the latter.

A. Depreciation Loss on Merger

Whidden seeks to recover for a depreciation loss it claims it incurred when it disposed of its assets via a statutory merger, for which the Secretary denied it reimbursement. The denial rests on two independent grounds. First, the Administrator found Whidden was not entitled to a

11

depreciation adjustment because a statutory merger must constitute a *bona fide* sale in order for a depreciation loss to be compensable. See A.R. at 24. As the Administrator found that no reasonable consideration was provided, she concluded that the transaction was not a *bona fide* sale, and thus any loss suffered was not reimbursable. See id. at 24-27. Second, the Administrator denied the reimbursement because Whidden failed to establish that the parties to the merger were unrelated, as the regulation requires. See id. at 27-29. Because the Court finds that the Administrator was justified in denying Whidden's request for reimbursement on the former ground, it need not reach the latter.

Whidden initially acknowledges that the D.C. Circuit has twice upheld "the Secretary's application of certain *bona fide* sale criteria to a statutory merger" as "not plainly erroneous or inconsistent with the regulations." See Pl.'s Mot. at 57 (citing St. Luke's, 611 F.3d at 904-06); Pl.'s Reply & Opp. at 32 (citing St. Luke's, 611 F.3d 900, and Forsyth, 639 F.3d 534). Whidden concedes, moreover, that the Circuit has held not only that a statutory merger must constitute a *bona fide* sale in order for a depreciation loss to be cognizable, but also "that a large disparity between the assets' purchase price and fair market value indicates that the transaction is not *bona fide*." Pl.'s Reply & Opp. at 32. Although it contests the Secretary's interpretation of the statutory-merger regulation in an attempt to "preserv[e] these arguments for appeal," Whidden acknowledges — as, indeed, it must — that the Court is bound by our Circuit's previous decisions. Id.

In light of this binding precedent, the only remaining question is whether the Administrator's finding that reasonable consideration was not exchanged in the merger was supported by substantial evidence and otherwise not arbitrary and capricious. See Forsyth, 639

F.3d at 537-39. In other words, with the relevant standard established, only its application is at issue.

Whidden challenges the Administrator's determination on the grounds that its merger was an arm's-length transaction and that it received reasonable consideration for its assets. See Pl.'s Mot. at 64-69. Although the Administrator's finding that Whidden had not engaged in arm's-length bargaining and instead sought to ensure the survival of its organization is additional support for its conclusion that the merger was not a *bona fide* sale, our Circuit has established that a finding that the parties to a merger "did not exchange reasonable consideration [is] an independent and sufficient ground for refusing . . . reimbursement." Forsyth, 639 F.3d at 539; see also St. Luke's, 611 F.3d at 905 ("[A] 'large disparity' between the assets' purchase price and their fair market value indicates the underlying transaction is not in fact bona fide."). The Court, therefore, need only ensure that the Administrator's conclusion that reasonable consideration was not exchanged here was supported by substantial evidence and not arbitrary and capricious.

Although Whidden appears to agree that the Administrator properly valued Whidden's liabilities at approximately $19 million in determining whether reasonable consideration was exchanged, it challenges the Administrator's valuation of its assets at approximately $37 million on three grounds. First, Whidden argues that the Administrator should have considered the appraised value of its property, plant, and equipment (almost $5 million) instead of its net book value (about $14.5 million). See Pl.'s Mot. at 67 n.54; Pl.'s Reply & Opp. at 35-36. This would have resulted in a valuation of the total assets transferred at approximately $27 million, not $37 million.

The Administrator did not err by taking the net book value of Whidden's property, plant, and equipment into consideration. See Forsyth, 639 F.3d at 538 ("[T]he Administrator conducted a comparison of the value of the assets sold and the consideration exchanged in the merger" by "compar[ing] the book value of [the Provider's] total assets . . . to its known liabilities."). In any event, it is not as if the Administrator refused to acknowledge the appraisal; instead, she expressly considered the appraised value of the property and found that reasonable consideration was lacking even using that valuation. See A.R. at 25-26; cf. Forsyth, 639 F.3d at 534 (considering both the net book value and the appraised value of the relevant property and depreciable assets). As the Administrator reasonably concluded, $19 million is not reasonable consideration for $27 million, the total value of the assets using the appraised value of the relevant property, any more than it is for $37 million, the total value of the assets using the net book value of that property.

Second, Whidden contends that, because the independent appraisers used an alternative-use methodology as opposed to a replacement-cost methodology, even the appraised value of that property was too high and, therefore, should have been further discounted. See Pl's Mot. at 67-68. The Administrator also considered Whidden's evidence on this point. See A.R. at 25-26 & n.28. Whether Whidden is correct that the alternative-use methodology inflated the appraisal value, however, is irrelevant: even had its depreciable assets and land been completely worthless (and not even Whidden contends that they were), the Administrator made clear that she still would have found a lack of reasonable consideration. See id. at 26. "[R]egardless of the value of the depreciable assets and land, even if imputed as zero, . . . the total value of the assets that were transferred exceeded the liabilities by a minimum of almost $3 million." Id. Put another way, even if the $14.5 million net book value of the property were entirely removed from the

14

$37 million total valuation of the assets, Whidden still would have exchanged more than $22.5 million in assets for consideration in the amount of $19 million.  Whidden, moreover, produced no alternative appraisal for the Administrator to consider.  See Forsyth, 639 F.3d at 539 (Provider bears the burden of proof to show *bona fide* sale).

Third, Whidden asserts that the majority of its remaining assets should be discounted in value to reflect their being fit only for limited use or not fully collectible.  See Pl's Mot. at 68-69.  In making this argument, it relies heavily on the Third Circuit's decision in UPMC-Braddock Hosp. v. Sebelius, 592 F.3d 427 (3d Cir. 2010), which indicated that "it may be appropriate to discount fair market value of assets 'to adjust for the fact that they [are] limited-use.'"  Id. at 434 (quoting Albert Einstein Med. Ctr. v. Sebelius, 566 F.3d 368, 379 (3d Cir. 2009)) (alteration in orginal).  Whidden, however, has provided no evidence as to how the Administrator ought to have discounted these assets.  In the absence of such evidence, the Administrator reasonably relied on the figures available to her.  Cf. Forsyth, 639 F.3d at 539.

Ultimately, Whidden received approximately $19 million in consideration for its assets, which had a net book value of approximately $37 million and an appraised value of approximately $27 million.  Using the latter figure, Whidden argues that its "assets were transferred for at least 70% of their fair market value."  Pl.'s Mot. at 67 (emphasis in original).  The Administrator did not act arbitrarily or capriciously in finding that 70% of the fair market value did not constitute reasonable consideration.  Indeed, "one would not expect a party earnestly negotiating in its own self interest to agree to such an exchange."  Jeanes v. Sebelius, 2010 WL 3855244, at *6 (E.D. Pa. Sept. 28, 2010) (finding that consideration amounting to 81% of fair market value does not demonstrate a *bona fide* sale). While the disparity in consideration was not as dramatic as in some other cases in which courts have found reasonable consideration

lacking, see, e.g., St. Luke's, 662 F. Supp. 2d at 104, the Administrator's conclusion was well within the bounds of reason. The 70% figure, furthermore, already includes a $10 million discount from the net book value of the property — using that figure, the consideration received amounted only to 51% of the fair market value.

In addition, although our Circuit has held that a significant disparity in consideration is sufficient to support a finding that no *bona fide* sale took place, see Forsyth, 639 F.3d at 539, the Administrator did not stop there. Specifically, she also found it significant that Whidden's assets were not appraised prior to the commencement of merger negotiations. See A.R. at 24-25. She noted that "[t]he fact that the existing asset appraisal was generated by the Provider almost four months after the merger, despite the two years of negotiations, [did] not support the claim that the Provider was seeking to obtain the best price for its assets." Id. at 25. In addition, the Administrator determined that "[t]he absence of a calculation and determination of the value of the Provider's assets by the Provider before the commencement of the transaction . . . to ensure that such assets were transferred to MWHA for reasonable consideration [was] evidence that the Provider was not involved in a *bona fide* sale . . . ." Id. Instead, the Administrator concluded that "the record show[ed] that the primary motivation for seeking a partner was 'long term survival.'" Id.

"The burden of proof to show that a *bona fide* sale occurred rested on [Whidden]." Forsyth, 639 F.3d at 539. Because the Court finds that the Administrator reasonably concluded on the basis of substantial evidence that Whidden failed to carry that burden, it will grant summary judgment for the Defendant on this issue.

B. New-Provider Exemption

At the time the Whidden TCU applied for a new-provider exemption to the SNF routine

cost limits (RCLs), the relevant regulation provided:

> Exemptions from the limits imposed under this section may
> be granted to a new provider . . . .  A new provider is a
> provider of inpatient services that has operated as the type
> of provider (or the equivalent) for which it is certified
> under Medicare, under present and previous ownership, for
> less than three full years.

42 C.F.R. § 413.30(e) (1997).  In other words, an SNF can qualify for the exemption by showing

either that it is a new facility or that it is "operating for the first time as an SNF or equivalent."

St. Elizabeth's, 396 F.3d at 1231. Additionally, "[i]n some instances, the new provider

exemption may also be available to relocated providers, provided they can show that 'in the new

location a substantially different inpatient population is being served.'"  Id. (quoting Provider

Reimbursement Manual (PRM) § 2604.1).

The Administrator concluded the TCU did not qualify for the exemption because (1)

purchasing operating rights from Care Well meant that it was not a "new" facility, but rather had

operated under the prior ownership of Care Well, and (2) Care Well had operated as the

equivalent of an SNF.  See A.R. at 27-44.  "Under the terms of the governing regulation, both

conclusions had to be made to disqualify the TCU from the exemption."  St. Elizabeth's, 396

F.3d at 1233 (citing 42 C.F.R. § 413.30(e) (1997)).  Because the Court finds that the

Administrator's determination regarding the latter was unsupported by substantial evidence, it

will not address the former. In addition, Whidden's argument in the alternative that it qualifies as

a relocated provider is thus moot.

In St. Elizabeth's, our Circuit held that in order to be considered the equivalent of an SNF

for purposes of the new-provider exemption, the former facility must have been "primarily

engaged in providing skilled nursing or rehabilitative care."  396 F.3d at 1234 (emphasis in

17

orginal). "[T]he Administrator conclude[d] that Care Well was 'primarily engaged' in operating a SNF under the St. Elizabeth standard" because the Massachusetts Medicaid Management Minutes Questionnaire (MMQ) documents in the record established that "the portion of the patient population receiving skilled nursing and related services or rehabilitative service was 52 percent in FY 1992, 71 percent in FY 1993, and 73 percent in FY 1994." A.R. at 43. The Administrator, accordingly, appears to agree that "primarily" means more than 50%. See id. at 43 & n.60; see also Milton Hosp. Transitional Care Unit v. Thompson, 377 F. Supp. 2d 17, 27-28 (D.D.C. 2005).

Whidden challenges these calculations on myriad grounds. See Pl.'s Mot. at 26-40. Fortunately, however, the Court need not dissect the parties' analyses of the voluminous record on particular medical services or evaluate the soundness of the Administrator's conclusion that, for example, "restorative nursing" is a "skilled service" under Medicare regulations. See A.R. 82-86, 71-74; Pl.'s Mot. at 33. This is because even if the Court were to accept every single one of the Secretary's classifications and arguments in support of its conclusion that Care Well was "primarily engaged in" providing skilled nursing and related services, the Secretary has admittedly established only that "more than half of its patients received skilled services more than half the time." Def.'s Reply at 39. If half of the patients received skilled services half of the time, that means skilled nursing services were being provided only one quarter of the time. As any fifth grader could explain (except perhaps this Court's children), 50% of 50% is 25%, not 50%. Whether "primarily" means providing all of the patients skilled nursing services more than half the time or providing more than half of the patients such services all of the time, an institution engaged in providing skilled nursing services 25% of the time is not "primarily engaged in providing" those services.

18

The Court's conclusion that the Administrator erred in determining Care Well was primarily engaged in providing skilled nursing services is bolstered by an examination of the Massachusetts regulatory regime. While Level II facilities like the TCU were licensed to "provide <u>continuous</u> skilled nursing care," as a Level III facility, Care Well was licensed only to "provide routine nursing services and <u>periodic</u> availability of skilled nursing." 150 Mass. Code Regs. § 150.001 (emphasis added). Whidden thus correctly points out that Care Well likely could not have primarily provided skilled nursing services without acting outside the authority of its license. <u>See</u> Pl.'s Mot. at 20-21.

The Court thus concludes that the Administrator's determination that Care Well, a facility with eight resident bedrooms in an old Victorian-style wooden home, <u>see</u> A.R. at 2837, 2839 (Aff. of Neil McCole), ¶¶ 1, 7, was primarily engaged in providing skilled nursing services was arbitrary and capricious and unsupported by substantial evidence. With respect to this issue, therefore, it will grant Plaintiff's Motion for Summary Judgment, vacate the Administrator's ruling, and remand to the agency for further proceedings. <u>See, e.g.</u>, <u>Milton</u>, 377 F. Supp. 2d at 31 (vacating and remanding to the agency "for further consideration of the plaintiff's new provider exemption request for its skilled nursing facility").

## IV. Conclusion

For the aforementioned reasons, the Court will grant Defendant's Motion for Summary Judgment on the statutory-merger claim and grant Plaintiff's Motion for Summary Judgment on the new provider-exemption claim. A separate Order consistent with this Opinion will be issued this day.

/s/ James E. Boasberg
JAMES E. BOASBERG
United States District Judge

Date: <u>December 14, 2011</u>